**BENBROOK LAW GROUP**
Bradley A. Benbrook (No. 177768)
 E-mail: brad@benbrooklawgroup.com
Stephen M. Duvernay (No. 250957)
 E-mail: steve@benbrooklawgroup.com
701 University Ave., Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900, Facsimile: (916) 447-4904

**COOPER & KIRK, PLLC**
David H. Thompson*
 E-mail: dthompson@cooperkirk.com
Peter A. Patterson*
 E-mail: ppatterson@cooperkirk.com
Joseph O. Masterman*
 E-mail: jmasterman@cooperkirk.com
1523 New Hampshire Ave., NW
Washington, D.C. 20036
Telephone: (202) 220-9600, Facsimile: (202) 220-9601
 *Motion to Appear Pro Hac Vice Forthcoming

Attorneys for Plaintiffs CHRISTOPHER GLASS
and FIREARMS POLICY COALITION, INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| CHRISTOPHER GLASS and FIREARMS POLICY COALITION, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF SAN JOSE; ANTHONY MATA, in his official capacity as Chief of Police of the City of San Jose; and JENNIFER MAGUIRE, in her official capacity as City Manager of the City of San Jose, <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES** |

## INTRODUCTION

1. The City of San Jose has enacted an ordinance requiring law-abiding residents to pay two separate charges merely for exercising their fundamental right to keep and bear arms. First is an annual fee assessed on firearm owners and only firearm owners. Second is the cost of maintaining now-mandatory firearm insurance ("insurance provision"). *See* SAN JOSE, CAL. ORDINANCE No. 30716 §§ 10.32.210, .215 ("ORD.").[1]

2. City officials have promoted the Ordinance as the first of its kind. *See* Mem. from Mayor Liccardo, et al., at 3 (Jan. 21, 2022) (Ex. A). They have also made clear that a main reason for the Ordinance is to limit the exercise of Second Amendment rights by creating an "opportunity" for police to "remove" firearms from otherwise law-abiding citizens who lack a form attesting to their compliance with the Ordinance. Mary Harris, *San Jose's New Gun Law Is the First of Its Kind*, SLATE (Feb. 3, 2022), https://bit.ly/3sIaCbB (Ex. B); *see also* Ex. A at 4; ORD. § 10.32.245 (providing for impoundment).

3. The Ordinance is facially unconstitutional in several ways.

4. The fee and insurance provisions violate the Second Amendment. The government may not impose a fee on the choice to exercise a constitutional right. But that is exactly what the Ordinance does. The government also may not restrict firearm ownership in ways that are wholly unknown to the Nation's history and that fail entirely to advance the government's asserted goals. Novelty is not a virtue here, and neither are restrictions for restriction's sake. But the Ordinance is concededly novel, and it will neither improve public safety nor reduce the costs of gun violence. It will only burden those who already follow all firearm laws. Even City officials admit that, "[o]f course, *criminals won't obey insurance or fee mandates*." Ex. A at 4 (emphasis added).

5. The fee provision also violates the First Amendment. The Ordinance directs the City Manager to designate a nonprofit organization that will spend firearm owners' money on "programs and initiatives" to "mitigate" the supposed "risk" of the "possession of firearms." ORD. § 10.32.220(C). The fee provision thus forces firearm owners to associate with an organization of the City's choosing

---

[1] For ease of reference, this Complaint refers to sections of the Ordinance according to the section numbers now codified in Part 6 of Chapter 10.32 in the San Jose Municipal Code.

and subsidize expressive activities of the organization's choosing, in violation of the U.S. Supreme Court's ruling in *Janus v. American Federation of State, County & Municipal Employees*, 138 S. Ct. 2448 (2018).

6. Plaintiffs therefore request a judgment declaring the Ordinance unconstitutional on its face, permanently enjoining Defendants and their agents from enforcing the Ordinance, and awarding nominal damages, damages for any loss attributable to the Ordinance incurred before final judgment, attorney's fees, and any other relief that the Court deems just and proper.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

8. Plaintiffs seek relief under 28 U.S.C. § 2201 and 42 U.S.C. §§ 1983 and 1988.

9. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (b)(2).

## DIVISIONAL AGREEMENT

10. Pursuant to Local Civil Rule 3-2(e), this case is properly assigned to the San Jose Division because it arises from the City of San Jose in Santa Clara County.

## PARTIES

11. Plaintiff Christopher Glass is a law-abiding firearm owner and resident of San Jose. He does not hold a concealed-carry permit and, though he does hold a renter's insurance policy, the policy documents in his possession do not specifically address loss or damage resulting from a firearm. Although he has no history of criminal offenses or mental-health issues, under the Ordinance he will be unable to continue possessing firearms unless he pays the annual fee and maintains compliant firearm insurance.

12. Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a non-profit organization incorporated under the laws of Delaware with a place of business in Sacramento, California. The purposes of FPC include defending and promoting fundamental rights, especially, but not limited to, the Second Amendment right to keep and bear arms. FPC serves its members and the public through legislative advocacy, grassroots advocacy, research, education, outreach, and other programs. FPC brings this action on behalf of its members in San Jose, including Plaintiff Glass.

13. Defendant City of San Jose is a municipality incorporated within the County of Santa Clara, California.

14. Defendant Anthony Mata is the Chief of Police of the City of San Jose. As such, he is the head of the City's police department, *see* SAN JOSE, CAL. MUN. CODE § 2.04.4010, with the power and duty to administer the department's operations, *see id*. § 2.04.4020(A)(1). San Jose police officers are "empowered to enforce, and are charged with the duty of enforcing, any and all provisions of [the San Jose] Code, or any other ordinance of the city." *Id*. § 1.08.040(A). These include the Ordinance and its attendant penalties. Defendant Mata is being sued in his official capacity.

15. Defendant Jennifer Maguire is the City Manager for the City of San Jose. As such, she is responsible for implementing the Ordinance, including by promulgating the attestation form, designating the nonprofit organization to receive the annual fees, and charging and collecting the costs associated with enforcing the Ordinance. *See* ORD. § 10.32.235, .250. The City Manager is also authorized to designate city employees to issue administrative citations under SAN JOSE, CAL. MUN. CODE § 1.15, which is one of the punishments for violating the Ordinance. *See* ORD. § 1.08.040(C). Defendant Maguire is being sued in her official capacity.

**STATEMENT OF FACTS**

**I.  Passage of the Ordinance**

16. On June 29, 2021, the San Jose City Council directed the City Attorney to draft "an ordinance for Council consideration that would require every gun owner residing in the City of San José, with certain exceptions, to obtain and maintain a City-issued document evincing payment of an annual fee, and attestation of insurance coverage for unintentional firearm-related death, injury, or property damage." Mem. from City Att'y Frimann at 1 (Jan. 14, 2022) (Ex. C).

17. For penalties, the Council directed that "[f]ailure to comply shall constitute a civil violation subjecting the owner to the temporary or permanent seizure of the gun, and under specified circumstances, a fine." *Id*. at 2. As the Mayor explained in later memoranda, seizing firearms is the police's primary role under the Ordinance. *See* Mem. from Mayor Liccardo at 2 (Jan. 24, 2022) (Ex. D).

18. On January 14, 2022, the City Attorney returned a draft of the Ordinance in line with these directions. The City Council held a first reading on January 25, 2022.

19. In the intervening period, the City Council received several memoranda containing the purported empirical bases for the Ordinance. The first, sent by Mayor Liccardo on January 19, attached a report commissioned from the Pacific Institute for Research and Evaluation (PIRE) on the "Incidence and Cost of Firearm Injuries in San Jose, CA." *See* Mem. from Mayor Liccardo (Jan. 19, 2022) (Ex. E).

20. This report attempts to measure the "public cost of firearm injury" in San Jose, including the annual cost of responding to firearm deaths and injuries, which the report sets at $151 per gun-owning household. *See id.*, attach. at 4 ("PIRE Report").

    a. The report estimates that 206 people are killed or injured by firearms in the City per year, yielding an estimated $7.9 million in police and fire-department response costs. *See id.* at 1–2. Based on background-check data from firearm sales between 2002 and 2015, the report also estimates that firearms are present in 50,000 to 55,000 San Jose households, while acknowledging that these numbers likely undercount the lawfully owned firearms in the City. *See id.* at 2–3. The report apparently splits the difference, dividing $7.9 million by 52,500 to reach $151.

    b. The report also estimates the "societal cost" of firearm injury, including, *e.g.*, healthcare costs. According to the report, "[h]omicide and assault cause most (57%) of the firearm costs," while unintentional shootings account for only 6%. *Id.* at 5.

21. The PIRE Report offers nothing to suggest that either an annual fee or an insurance requirement would reduce these estimated costs.

    a. Among other issues, the report does not state what proportion of its estimated costs result from firearms held by criminals—who, as City officials admit, will not comply with the fee or insurance provisions.

    b. Conversely, the report does not attempt to measure the proportion of response costs caused by law-abiding gun owners, and thus cannot explain how their compliance with the Ordinance would deter or defray such costs. It is self-evident, however, that the vast majority of the 55,000 households included in the report play no part in the estimated 206 annual firearm incidents resulting in injury or death. The report's claim that the City

"spends an average of $151" per each of those households is therefore misleading at best.

    c. Even assuming widespread compliance, the report also does not attempt to explain how the fee provision would reduce any costs estimated in the report. In fact, the report recognizes that enforcing firearm regulations itself entails police costs. *See id*. at 2 (noting that the cost estimate omits "police costs of weapons violations and gun thefts"). And the insurance requirement would apparently *contribute* to the report's estimate of so-called societal costs, which "includes costs paid by," among others, "insurers." *Id*. at 4.

    d. Moreover, the PIRE Report reached its estimated 206 firearm incidents by including "Legal Intervention," which the report groups with "Assault" and "Homicide"—the largest category of incidents. *Id*. at 1. The report does not explain whether these legal interventions include use of firearms by "peace officers," who are not subject to the Ordinance, *see* ORD. § 10.32.225, and/or in self-defense. Either way, these types of incidents will occur with or without the Ordinance, and the report makes no attempt to discount the costs associated with such incidents.

22. On January 21, the City Attorney sent another memorandum, listing the "sources used in the recitals of the proposed ordinance." *See* Supp. Mem. from City Att'y Frimann at 1 (Jan. 21, 2022) (Ex. F). Along with the PIRE Report, these sources are the basis for the list of recitals and findings at the beginning of the Ordinance as enacted.

    a. Of the seventeen sources cited, most (fourteen) provide no data specific to San Jose, instead ranging from studies of nationwide or statewide data to news stories about events in other states. Two others are CDC datasets that can be queried for data about San Jose, but they provide only census data about death totals.

    b. None of these sources offer evidence that an annual fee or insurance requirement would reduce the incidents or costs of firearm injury in San Jose, or for that matter anywhere else. They do not calculate the municipal costs of firearm injury, propose an annual fee or insurance requirement as solutions, or assess the efficacy of those supposed solutions.

        Only one of these sources touches on any of these relevant subjects: an article that offers guidance to insurance actuaries for quantifying firearm risk. Kristen Moore & Craig Reynolds, *Firearm Insurance: An Insurance Perspective*, THE ACTUARY (June/July 2018) (Ex. G). But this article makes no argument that firearm insurance should be required; the authors "deliberately do not take a stand on policy issues related to firearms." *Id.*

    c.    That leaves the one source with some relation to San Jose: a 2018 study of firearm ownership and firearm injuries in Santa Clara County. *See* SANTA CLARA CTY. PUB. HEALTH, *Firearms in Santa Clara County* (Apr. 2018) (Ex. H). Although this study provides an estimate of medical and work-loss costs, it again offers no evidence that those or other costs would be reduced by imposing an annual fee or insurance requirement on law-abiding firearm owners.

23.    In a separate memorandum sent the same day, the Mayor, joined by the Vice Mayor and two other councilmembers, offered further arguments in favor of the Ordinance. *See* Ex. A. Starting with the insurance provision, the memorandum asserts that "[r]isk-adjusted premiums can—and in some cases, do—reduce the risk of gun harm, by encouraging" firearm-safety measures. *Id.* at 3.

    a.    The memorandum cites no firearm-insurance policies with risk-adjusted premiums or any case where such a policy has affected behavior in this way. Instead, it links to a public health advocacy piece purportedly finding that "reducing premiums on policyholders who drive more safely . . . helped to reduce per-mile auto fatalities by 80% over the past five decades." *Id.* The advocacy piece, however, does not mention car insurance.[2]

    b.    The memorandum also states that "[r]equiring every gun owner in [the] city to carry liability insurance will better compensate unintentional shooting victims and their families." *Id.* But the memorandum does not indicate how many San Jose victims are currently going uncompensated or how that gap would be filled with insurance for

---

[2] The memorandum and its hyperlinks are available at https://bit.ly/37LECLR (last visited Apr. 26, 2022).

7
COMPLAINT

accidental shootings by law-abiding citizens—who, the memorandum admits, are the only citizens who would obtain insurance. *See id*. at 4. And insurance would not cover criminal shootings or the municipal costs estimated in the PIRE Report.

24. As support for the fee provision, the memorandum relies primarily on sources already listed in the City Attorney's memorandum—*i.e.*, sources that do not suggest that a fee on law-abiding firearm owners would reduce firearm injuries in San Jose. The memorandum also links to sources purporting to show that "the public [is] subsidiz[ing] gun ownership" at a cost of "$1.4 billion for all Californians." *Id*. at 4. But again, these sources do not show that the fee provision would defray the public costs of responding to firearm violence rather than simply impose an additional cost on law-abiding firearm owners.

  a. Indeed, the memorandum argues that the City may simply charge citizens for the lawful exercise of a constitutional right because "courts have long upheld the imposition of taxes on the purchase of guns and ammunition ever since Congress imposed the federal gun tax in 1919." *Id*. In apparent support, the memorandum provides a hyperlink to an article on a wholly unrelated topic that mentions neither this tax nor the Second Amendment.

  b. The memorandum further asserts that courts have permitted fees on the exercise of other constitutional rights, yet it links to a landmark case where the U.S. Supreme unanimously held that a tax on newspapers was unconstitutional. *See Grosjean v. Am. Press Co.*, 297 U.S. 233, 251 (1936). The memorandum also makes no effort to explain how any holdings under other constitutional provisions would comport with the original meaning of the Second Amendment.

25. In the end, the memorandum is forced to admit that, "[o]f course, criminals won't obey insurance or fee mandates," and thus that the Ordinance will do nothing to deter criminal gun violence. Ex. A at 4.

26. "Yet," the memorandum argues, "given the legally frail status of concealed-carry regulations before the current U.S. Supreme Court" in *New York State Rifle & Pistol Association v. Bruen*, No. 20-843 (2021), the City "will likely see many more guns out on the street"—guns that the

Ordinance empowers police officers to confiscate. Ex. A at 4. In other words, the Ordinance is a prophylactic attempt to limit a constitutional right that the Supreme Court might soon recognize.

27. The Ordinance passed its first reading on January 25, 2022, and it was adopted on second reading on February 8, 2022. *See* City of San Jose, Guide to Council Meetings, https://bit.ly/3vN1K66 (last visited Apr. 22, 2022) (Ex. I). The Ordinance takes effect 180 days after its adoption. *See* Ord. at 13 (Section 2).

## II. Text of the Ordinance

28. The Ordinance defines a "firearm" to include "a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion. Firearm does not include antique firearms as defined by 18 U.S.C. [§] 921(a)." Ord. § 10.32.205(A).

29. Under the insurance provision, "[a] person who resides in the City and owns or possesses a Firearm in the City shall obtain and continuously maintain in full force and effect a homeowner's, renter's or gun liability insurance policy from an admitted insurer or insurer as defined by the California Insurance Code, specifically covering losses or damages resulting from any accidental use of the Firearm, including but not limited to death, injury or property damage." *Id*. § 10.32.210(A).

    a. Unless the City Manager provides otherwise, any San Jose resident who owns a firearm on the Ordinance's effective date must obtain qualifying insurance within thirty days. *See id*. § 10.32.210(C). A person is deemed to own a firearm even "if such Firearm is lost or stolen" until he reports the loss or theft to his local police department or sheriff. *Id*. § 10.32.210(B).

30. Under the fee provision, "[a] person who resides in the City and owns or possesses a Firearm in the City shall pay an Annual Gun Harm Reduction Fee to the Designated Nonprofit Organization each year." *Id*. § 10.32.215.

    a. The Ordinance authorizes the City Council to set the fee amount, which the Ordinance does not cap. *See id*.

    b. The Ordinance authorizes the City Manger to choose the "Designated Nonprofit Organization." *Id*. § 10.32.205(B). The only limit on this choice is that "[n]o City

        official or employee shall sit on the board of directors of the Designated Nonprofit Organization." *Id*.

   c. The proceeds of the annual fee "shall be expended by the Designated Nonprofit Organization on providing services to residents of the City that own or possess a Firearm in the City, to members of their household, or to those with whom they have a close familial or intimate relationship." *Id*. § 10.32.220(A). These "services" include: "Suicide prevention services or programs; Violence reduction or gender based violence services or programs; Addiction intervention and substance abuse treatment; Mental health services related to gun violence; or Firearms safety education or training." *Id*. § 10.32.220(A)(1)–(5).

   d. The Ordinance further directs the designated nonprofit to spend all fee proceeds, "minus administrative expenses, exclusively for programs and initiatives designed to (a) reduce the risk or likelihood of harm from the use of firearms in the City of San José, and (b) mitigate the risk of physical harm or financial, civil, or criminal liability that a San José firearm owner or her family will incur through her possession of firearms." *Id*. § 10.32.220(C). But "[o]therwise, the City shall not specifically direct how the monies from the Gun Harm Reduction Fee are expended," *id*., and those expenditures "are not necessarily limited to" the above categories, *id*. § 10.32.220(A).

31. The Ordinance also authorizes the City Manager "to charge and collect any and all cost recovery fees associated with fulfilling the policies of this [Ordinance] relating to the reduction of gun harm" at rates established by the City Council. ORD. § 10.32.250. Since the Ordinance applies only to firearm owners, these are additional charges that the Ordinance creates specifically for firearm owners.

32. Firearm owners are exempt from these provisions if they serve or have served as peace officers, if they hold a California concealed-carry license, or if "compliance . . . would create a financial hardship" according to criteria established by the City Manager. *Id*. § 10.32.225(A)–(C). Plaintiff Glass does not qualify for the first two exemptions and, though the annual fee imposes an undue financial burden, does not expect to qualify for the third.

      a. The exemption for concealed-carry license holders lasts only "for as long as these statutes [California's concealed-carry licensing statutes] are legally enforceable." ORD. § 10.32.225(B). In other words, if the Supreme Court's *Bruen* decision renders unenforceable California's restrictions on concealed-carry licenses, the exemption will expire.

33. In addition to maintaining insurance and paying the annual fee, non-exempt firearm owners must execute a form and keep it wherever they keep their firearms.

      a. Firearm owners must "demonstrate compliance with the insurance requirement by completing and executing a City-designated attestation form," listing their insurer and policy number and signing under penalty of perjury. *Id*. § 10.32.230(A). They must execute a new form if any information changes, *see id*., "affix proof of payment of the annual Gun Harm Reduction Fee" to the form, *id*. § 10.32.230(B), and keep the form "with the Firearms where they are being stored or transported," *id*. § 10.32.230(A).

      b. To comply with the last requirement, owners of multiple firearms apparently must execute separate attestation forms, with separate proofs of fee payment, in order to travel with one firearm while leaving others at home.

34. As the Mayor and other legislators emphasized when supporting the Ordinance, enforcement is accomplished through random document checks: "Each person shall present the form when lawfully requested to do so by a peace officer who knows or has reason to believe that a person possesses a firearm." *Id*. § 10.32.230(A).

35. Penalties for noncompliance are severe.

      a. "Any violation" of the insurance or fee provisions "shall be punishable by an administration citation," including "administrative fines" set by the City Council, and "all other civil and administrative remedies available to the City." *Id*. § 10.32.240(A)–(C).

      b. Lacking or merely forgetting an attestation form can also lead to a complete loss of Second Amendment rights: "the Firearm or Firearms of a person that is not in

compliance with this Part may be impounded subject to a due process hearing." *Id*. § 10.32.245.

### III. Impact on Plaintiffs

36. Several members of Plaintiff FPC, including Plaintiff Glass, possess firearms in San Jose. Under the Ordinance, they cannot continue to do so unless they pay the annual fee according to the schedule established by the City Manager. *See* ORD. § 10.32.215. They thus face the imminent choice between suffering a burden on their Second Amendment rights or exercising those rights and facing the legal consequences of not paying the fee.

37. This fee will in turn fund an organization free to impose "programs and initiatives" that Plaintiffs have no need or desire to participate in, *id*. § 10.32.220(C), and to convey messages about firearm ownership, *see id*. § 10.32.220(A).

38. The Ordinance also prohibits San Jose firearm owners from continuing to exercise their Second Amendment right to possess firearms without obtaining compliant firearm insurance. Although Plaintiff Glass holds a renter's insurance policy, the policy documents in his possession do not indicate that it specifically covers loss or damage from the accidental use of a firearm. On information and belief, not all homeowner's and renter's insurance policies provide such coverage, and insurers do not offer standalone "gun-liability" policies. At a minimum, therefore, Plaintiff Glass will need to undertake the burden of ensuring that his existing policy complies with the Ordinance's vague requirements.

39. The burdens do not end with obtaining insurance.
   a. San Jose firearm owners must *maintain* compliant insurance, and pay the annual firearm fee, for as long as they possess firearms. They do not have the freedom both to possess firearms and to forgo renter's insurance or switch to a more affordable homeowner's insurance policy without firearm coverage.
   b. San Jose firearm owners must also keep an attestation form and current proof of fee payment wherever their firearms are located and must submit to inspection by law-enforcement officers.

40. The passage of the Ordinance has also forced Plaintiff FPC to divert resources to protecting the Second Amendment rights of Plaintiff Glass, its other San Jose members, and San Jose firearm owners generally. These are resources that FPC would otherwise have used to accomplish its organizational objectives.

## COUNT ONE

## VIOLATION OF THE SECOND AND FOURTEENTH AMENDMENTS

## (42 U.S.C. § 1983)

41. The foregoing paragraphs are incorporated as if alleged herein.

42. The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

43. The Second Amendment applies against state and local officials. *See McDonald v. City of Chicago*, 561 U.S. 742, 790 (2010); *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012).

44. The "individual right to possess and carry weapons" is a "natural right" that must be given the same scope today as it was understood to have when the Second Amendment was adopted. *District of Columbia v. Heller*, 554 U.S. 570, 592, 594 (2008).

45. The Ordinance's fee and insurance provisions infringe upon this right in violation of the Second Amendment.

46. The government "may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943). But that is what the Ordinance does. The annual fee operates as a charge for the privilege of exercising a fundamental right. The insurance requirement effectively does the same, as do any "cost recovery fees" that the City might impose on firearm owners under ORD. § 10.32.250. The Ordinance is unconstitutional for this reason alone.

47. The fee and insurance provisions are further unconstitutional because they impede the right to keep and bear arms protected by the Second Amendment.

48. Neither provision is based in any "historical tradition" of firearm regulation. *Heller*, 554 U.S. at 626–28. City officials have themselves touted the Ordinance as the first of its kind. *See* Ex. A at 3. As such, the Ordinance is categorically invalid under *Heller*.

49. Even if the Ordinance were instead subject to means-ends scrutiny, it still violates the Second Amendment. The fee and insurance provisions directly and substantially burden the core Second Amendment right to possess firearms for self-defense and other lawful purposes. The Ordinance should therefore be subjected to strict scrutiny. In any event, it is at least subject to heightened scrutiny under the standard currently operative in the Ninth Circuit. *See, e.g.*, *United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013). And the Ordinance fails any level of heightened scrutiny.

50. Neither the fee nor the insurance provision is tailored, narrowly or otherwise, to the City's apparent goal of reducing gun violence and its associated costs. As seen above, none of the evidence before the City, and incorporated in the Ordinance's recitals and findings, suggested that Ordinance would have that effect. Among other issues:

   a. The Ordinance imposes no restrictions on the criminals who commit gun violence, who are responsible for the majority of the estimated municipal costs of gun violence, *see* PIRE Report tbl. 2, and who, as the Mayor admitted, will not comply with the Ordinance.

   b. The annual fee will not even be used to defray any of the municipal costs estimated in the PIRE Report. Instead, the Ordinance singles out already law-abiding citizens to pay for anticipated services that they do not need, that are largely unrelated to safe firearm ownership, and that are thus unlikely to reduce such costs.

   c. The required insurance also will not reimburse any purported municipal costs of firearm injuries or any costs resulting from criminal violence.

51. The fee and insurance provisions thus fail to serve their purported purpose. This failure confirms what City officials have already implied: that the Ordinance's actual purpose is to reduce firearm ownership by increasing deterrent costs, creating a pretext for confiscating firearms, *see* Ex. A

at 4, and outsourcing firearm regulation to private insurers, *see id.* at 3, apparently in the hope that they will regulate firearm owners in ways that the City is unwilling or constitutionally unable to do itself.

52. The City plainly has alternative means to address gun violence that would be less restrictive of Second Amendment rights. Indeed, no other government in the country has addressed gun violence by creating a pretext for firearm confiscation. San Jose itself already has measures, such as the Gang Prevention Task Force and Gun Violence Restraining Orders, aimed at reducing gun violence, as the Mayor acknowledged in one memorandum. *See* Ex. D at 3–4. The City could have considered whether enhancing those measures would have accomplished the same goals as the Ordinance, a question the Mayor's memorandum does not confront. *See id.* And the City could have considered increasing the funding for such measures through a general tax.

53. These alternatives are by no means exhaustive, and Plaintiffs need not prove that any alternatives would be constitutional. But the City must show that it cannot achieve its goals without restricting protected activity as the Ordinance does. And the City cannot do so.

## COUNT TWO

## VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS

### (42 U.S.C. § 1983)

54. The foregoing paragraphs are incorporated as if alleged herein.

55. The First Amendment provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I.

56. The First Amendment applies against state and local officials, *see Gitlow v. New York*, 268 U.S. 652, 666 (1925); *Nordyke v. Santa Clara Cty.*, 110 F.3d 707, 710 (9th Cir. 1997).

57. The freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning," no less so when one is compelled to "*subsidize*" another's speech. *Janus v. Am. Fed'n of State, Cty., & Mun. Emps.*, 138 S. Ct. 2448, 2464 (2018) (internal quotation marks omitted; emphasis in original).

58. A law compelling citizens to subsidize speech by, and thereby to associate with, other speakers should therefore be subjected to strict scrutiny. *See Riley v. Nat'l Fed'n of the Blind of*

*N. Carolina, Inc.*, 487 U.S. 781, 796–97 (1988). But at the very least, the law must satisfy "exacting scrutiny," meaning that it must "serve a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." *Janus*, 138 S. Ct. at 2465 (internal quotation marks omitted).

59. The Ordinance requires the Designated Nonprofit Organization to "spend every dollar generated from the Gun Harm Reduction Fee" on "programs and initiatives" about the supposed "risk" of "possession of firearms." ORD. § 10.32.220(C).

60. Plaintiffs disagree with the Ordinance's assumption that exercising a constitutional right is an inherently dangerous activity. Yet the fee provision requires all San Jose firearm owners to subsidize the organization's speech on this "matter of great public concern" and on any other related issues that the organization chooses to address through its programs and initiatives. *Janus*, 138 S. Ct. at 2475 (internal quotation marks omitted).

61. As shown above, the City could accomplish the Ordinance's objectives "through means significantly less restrictive of" firearm owners' "associational freedoms." *Id*. at 2465. The fee provision thus fails even "exacting" scrutiny.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court:

A. Enter judgment declaring the Ordinance unconstitutional.

B. Permanently enjoin Defendants and their agents from enforcing the Ordinance.

C. Award nominal damages and/or damages for any loss attributable to the Ordinance incurred before final judgment.

D. Award attorney's fees under 42 U.S.C. § 1988.

E. Award any other relief that the Court deems just and proper.

Dated: April 26, 2022									Respectfully submitted,

*/s/ Bradley A. Benbrook*

Bradley A. Benbrook (No. 177768)
Stephen M. Duvernay (No. 250957)
BENBROOK LAW GROUP, PC
400 Capitol Mall
Suite 2530
Sacramento, CA 95814
(916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

David H. Thompson*
Peter A. Patterson*
Joseph O. Masterman*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
jmasterman@cooperkirk.com

*Counsel for Plaintiffs*

*\*Motion to Appear Pro Hac Vice Forthcoming*